IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHARLES SHEPPARD,

         Plaintiff,         OPINION AND ORDER

   v.                   18-cv-152-wmc

DR. HOEM, SERGEANT KUSSMAL,
KYLE JORGENSON, and BETH EDGE,

         Defendants.

*Pro se* plaintiff Charles Sheppard is proceeding in this lawsuit under 42 U.S.C. § 1983 based on events that took place during his incarceration at the Wisconsin Secure Program Facility ("WSPF") in October of 2017. This court specifically granted Sheppard leave to proceed on his Eighth Amendment claims against former or current WSPF employees Correctional Sergeant Kussmal, Officer Kyle Jorgenson, Dr. Stacey Hoem, and Nurse Beth Edge acted with deliberate indifference to Sheppard's repeated reports that he was considering self-harm or suicide. Currently before the court are defendants' motion for summary judgment (dkt. #28), and Sheppard's request for assistance in recruiting counsel for purposes of mediation or trial (dkt. #52). For the reasons explained below with respect to defendants Jorgenson, Dr. Hoem and Edge, the evidence of record does not support a reasonable finding that any of these defendants were aware of a substantial risk that Sheppard would commit serious self-harm, so the court will grant defendants' motion as to them. However, in construing the record in Sheppard's favor, Kussmaul's alleged response to Sheppard's threat of self-harm may permit a reasonable jury to infer deliberate indifference, so the court will deny defendants' motion as to Kussmaul and that claim will

proceed to trial.  Finally, the court will deny Sheppard's motion for recruitment of counsel for purposes of trial, subject to renewal following his review of this court's order.[1]

## UNDISPUTED FACTS[2]

### A.  Background

Although currently incarcerated at Oshkosh Correctional Institution, plaintiff Charles Sheppard was incarcerated at WSPF on October 27, 2017, when the events comprising his claims in this lawsuit occurred.  Sheppard is proceeding against four defendants who were all WSPF employees at that time:  John Kussmaul was working at a correctional sergeant; Kyle Jorgensen was a correctional officer; Dr. Stacy Hoem was working as a licensed psychologist; and Beth Edge was working as a nurse clinician in the Health Services Unit ("HSU").

On October 26, 2017, Sheppard was seen in the HSU by a non-defendant doctor for severe bilateral leg pain.  Although Sheppard requested a high dose of gabapentin, the doctor prescribed him Lyrica 300 mg for 30 days, a pain killer he had taken in the past. Sheppard received his first dose of Lyrica at 9:00 p.m. that evening, with no complaint of pain or discomfort.  (Ray Decl., Exc. 1002 (dkt. #36-1) 7.)

---

[1] Since plaintiff's claims have been substantially narrowed, as likely have the number of witnesses and exhibits, the court sees little reason that he could not represent himself at trial with most, if not all, non-party witnesses appearing by videoconference.

[2] The court has drawn the following facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support.  Unless otherwise noted, these facts are material and undisputed when viewed in a light most favorable to plaintiff as the non-moving party.

**B. Sheppard's Self-Harm**

On October 27, 2017, Sheppard was housed in the general population.  Defendants Kussmaul and Jorgenson worked that day from 6:00 a.m. to 2:00 p.m.  At about 1:20 p.m., Sheppard began to feel despondent and suicidal because of continuing, severe leg pain, and when Officer Jorgenson walked by his cell, Sheppard told him he could not take the pain in his legs.  According to Sheppard, Jorgenson responded, "What do you want me to do," then walked away.  (Sheppard Decl. (dkt. #43) ¶ 6.)  Jorgenson does not recall this interaction.

At around the same time, Sheppard also called Sergeant Kussmaul via the emergency intercom button in his cell, requesting to see a psychological services unit ("PSU") clinician because he was "having suicidal thoughts and needed talk to a psychologist immediately."  (Sheppard Decl. (dkt. #43) ¶¶ 1, 5.)  However, Kussmaul attests that Sheppard said nothing about harming himself.  (Kussmaul Decl. (dkt. #31) ¶ 7.)

Regardless, there is no dispute that Sergeant Kussmaul then called Dr. Stacey Hoem and reported that Sheppard asked to see a PSU staff member.  According to both Kussmaul and Dr. Hoem, she asked him whether Sheppard said anything about suicidal ideation or self-harm, and Kussmaul responded in the negative.  Based on that response, Hoem told Kussmaul to have Sheppard send a written psychological service request form ("PSR" or "green slip").  Hoem further told Kussmaul that her afternoon that day was already "scheduled," but if something opened up, she would try to see Sheppard.  Finally, Hoem acknowledged that it was unlikely she would see Sheppard that day since he was already

3

scheduled to see a PSU clinician the following week.  Kussmaul responded that he would relay that information to Sheppard.

Dr. Hoem further attests that when she spoke to Sergeant Kussmaul, she was aware that Sheppard had a history of placement in clinical observation status, but was not routinely placed in observation status, nor was he known to engage in self-harm on a frequent basis.  Since Sheppard was not threatening self-harm, Hoem describes her response as "standard protocol."  Sheppard purports to dispute Hoem's actual knowledge of his history of suicidal ideations in October of 2017, asserting without elaboration that Dr. Hoem knew about his making a "very serious suicide attempt" in 2014.  (*Id.* ¶ 18.)

Sergeant Kussmaul represents that he did in fact inform Sheppard about Dr. Hoem's response as promised.  Although Sheppard does not directly dispute this, he maintains that he pushed his medical alert button again sometime after his first conversation with Kussmaul, and after taking ten minutes to respond, Kussmaul said, "What do you want now Sheppard?"  (Sheppard Decl. (dkt. #43) ¶ 9.)  When Sheppard repeated that he was going to commit self-harm, Kussmaul told him over the loud speaker: "PSU said they may not be able to see [you] today because she [was] busy but she'll pull [you] out tomorrow."  (Sheppard Decl. (dkt. #43) ¶ 7.)  According to Sheppard, Kussmaul also told him that he had reported to Hoem that he was having suicidal thoughts.  Still, Kussmaul never sent anyone to his cell front to speak to him.

At some point between his two conversations with Kussmaul, Sheppard also reports having a second exchange with defendant Jorgenson.  In particular, Sheppard told Jorgenson that he "would not be alive tomorrow," and although Jorgenson acknowledged

4

that statement, he walked away and did not return.  (*Id.* ¶ 8.)  Jorgenson also does not remember this exchange with Sheppard.  (Jorgenson Decl. (dkt. #32) ¶ 9.)

At approximately 8:00 p.m. on that same evening, Nurse Edge came to Sheppard's cell front to give him the prescribed pregabalin (Lyrica) 300 mg.  While Edge was providing his medication, Sheppard also told her that he was having thoughts of committing self-harm due to his severe nerve damage.  (Sheppard Decl. (dkt. #43) ¶ 12.)  According to Sheppard, Edge responded that there was "nothing" she could do.  For her part, Edge does not recall talking to Sheppard that day, but represents that she would have recorded any report from Sheppard along those lines and made no such record.

Sheppard attests that later on the evening of October 27,[3] he attempted to kill himself by stabbing a main vein in his stomach, reaching into the puncture wound, and attempting to pull and rip the vein out of his stomach.  Apparently, Sheppard then passed out from the pain and blood loss.  The record does not reveal when staff realized that Sheppard had stabbed himself and passed out, although he alleges in his complaint that the following day, Sheppard continued to threaten self-harm and "kept ripping the vein in his stomach."  (Compl. (dkt. #1) ¶¶ 21-22.)  The record does not reveal what happened between Sheppard's claimed, continued self-harm between October 28 and November 1,

---

[3] After the parties completed their briefing, Sheppard submitted an "Addendum," which contains additional, proposed factual findings and a declaration clarifying that he cut himself the night of October 27.  (*See* dkt. ##50, 51.)  Sheppard failed to seek leave of court to submit these additional materials, but the court will consider this clarification, particularly since it is reasonable to infer from his claim that he "kept ripping" at his would the next day that he first injured himself the evening of October 27, and his failure to say so explicitly was likely an innocent omission.  Still, as discussed below, the unaccounted for three-day delay is difficult to credit, as is his graphic description of the original and continued effort to harm himself, given the actual injury observed on November 1st.

but there is no suggestion that any of the defendants knew that Sheppard had committed self-harm or continued to do so.

### C. Sheppard's follow up medical care

Rather, HSU records show that Sheppard went to the HSU three days later, on November 1, 2017, where he was seen by a non-defendant, Nurse Tracey, for a self-harm wound. Specifically, Tracey noted a 1 cm wound, with a 0.25 cm depth on the right abdominal wall. Tracey further noted that Sheppard reported his pain was gone and that he felt good, which he now disputes. Instead, Sheppard claims that the wound was "festering" and "painful." (Sheppard Decl. (dkt. #43) ¶ 16.) And Tracey further describes tissue hanging from his stomach wound when he presented on November 1st.

Ultimately, there is no dispute that the wound was cleaned and Sheppard was placed on the schedule for a wound dressing. A doctor also ordered Sheppard Cephalexin 500 mg for 14 days. Later, when a culture of the wound came back positive for MRSA, the doctor changed the medication to clindamycin to treat that infection.


OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).

During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Here, defendants seek judgment in their favor on the merits of Sheppard's claims, as well as on qualified immunity grounds. The Eighth Amendment prohibits prison officials from responding to an objectively serious risk of harm with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994); *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018). There are, therefore, objective and subjective components to this claim. The objective component inquires into whether the risk is sufficiently serious. *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017). As for the subjective analysis, a defendant is deliberately indifferent if he "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Lisle v. Welborn*, 933 F.3d 705, 716-17 (7th Cir. 2019) (quoting *Collins v. Seaman*, 462 F.3d 757, 761 (7th Cir. 2006)). Deliberate indifference is "more than mere or gross negligence, but less than purposeful infliction of harm." *Id.* at 717 (quoting *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)).

Accordingly, to prove his claims against these defendants, Sheppard must adduce evidence that each was "cognizant of the significant likelihood that an inmate may imminently seek to take his own life," and failed to take preventative action. *Collins*, 462 F.3d at 761; *see also Davis -Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) ("A risk of future harm must be 'sure or very likely' to give rise to 'sufficiently imminent dangers'

before an official can be liable for ignoring that risk.") (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality)).  The court addresses these objective and subjective components below.

### A.  Substantial risk of serious harm

Defendants first seek judgment on the ground that Sheppard's stomach wound was not sufficiently serious to support an Eighth Amendment claim, citing the Seventh Circuit's recent decision in *Lord v. Beahm*, 952 F.3d 902 (7th Cir. 2020).  In *Lord*, a district court granted summary judgment on a similar Eighth Amendment deliberate indifference claim involving self-harm.  *Id.* at 904-05.  Specifically, while the Seventh Circuit found that Lord presented triable questions with respect to various correctional officers' failures to respond to his screams that he was going to kill himself with a razor blade, *id.* at 905, it concluded that his deliberate indifference claim failed as a matter of law because: "Lord's physical injuries consisted only of minor scratches, quickly and easily treated with a gauze bandage," and he "supplied no evidence that he suffered any other form of injury (for example, psychological harm) from his insincere suicide threat."  *Id.*  As such, the court affirmed the grant of judgment in defendants' favor because Lord sued for damages "without then developing evidence of a recoverable injury."  *Id.* (citing *Wilson v. Garcia*, 471 U.S. 261, 278 (1985); *Gabb v. Wexford Health Servs., Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("Section 1983 is a tort [and] [a] tort to be actionable requires injury.")).  In reaching this conclusion, however, the court explicitly cabined its decision to Lord's particular circumstances, particularly with respect to his focus

was on recovering "money damages solely for the risk to his life," which was not compensable without evidence of injury. *Id.*

In linking Lord's evidence of injury to that of Sheppard's here, defendants point to medical records showing that as of November 1, 2017, Sheppard had a 1 cm by 0.25 cm cut on his abdomen, which was treated with dressing and an antibiotic. The comparison is a fair one: the record of Sheppard's treated wound is undisputed and not remarkably significant. Still, there are a few important distinguishing points between Lord's and Sheppard's evidence of injury. For one, the recitation of the evidence in *Lord* suggests that after cutting himself with a razor blade, a correctional officer came to his cell and was able to immediately observe the degree of his injury. In Sheppard's case, there is no indication that *anyone* observed him shortly after, or (at least based on the record at summary judgment) even days after, he initially harmed himself. Furthermore, unlike Lord, Sheppard attests that his injury was so severe when he stabbed himself that he lost consciousness. (Sheppard Decl. (dkt. #43) ¶ 14.)

To be sure, Sheppard's insistence that he actually stabbed a "main vein," much less that he "reached into" a one-inch stab wound and pulled and ripped the vein out into the next day, is arguably incredible given the minimal treatment necessary just three days later, as is the absence of any other evidence corroborating his assertion that his blood loss was substantial. Still, the nurse's note describes "tissue" still hanging from the wound when treated on November 1, and Sheppard's sworn statement about blood loss and loss of consciousness must be credited, especially since defendants have not come forward with evidence that directly contradicts Sheppard's assertions about the severity of his initial

9

wound or pain.[4]  Given the limiting language in *Lord* related to plaintiff's narrow claim for "damages solely for the risk to his life," evidence of a stab wound to his stomach, however superficial, and Sheppard's more robust testimony of his pain and suffering, however open to impeachment, defendants are not entitled to judgment as a matter of law on the ground that Sheppard's injury was not sufficiently serious.

### B.  Deliberate indifference

Defendants also seek judgment on the ground that the record does not support a reasonable finding that any of them were aware of a significant likelihood that Sheppard would actually commit serious self-harm, relying on *Johnson v. Garant*, 786 F. App'x 609 (7th Cir. 2019).  In *Johnson*, the Seventh Circuit considered a plaintiff's claim that he asked three correctional officers transporting him to call a Crisis Intervention Team member because, among other things, he "wanted to commit suicide." *Id.* at 609.  The plaintiff also told the officers that he felt unsafe when placed in his cell, but they allegedly ignored him. *Id.*  Despite the plaintiff attempting suicide by burning his arm with a toilet paper roll he had set on fire, the Seventh Circuit affirmed the granting of judgment in the correctional officers' favor, concluding that the plaintiff's statement to the officers that he "felt suicidal and wanted to speak to a crisis counselor" was insufficient to provide "any indication that he may have 'imminently' sought to have harmed himself." *Id.* at 610 (citing *Collins*, 462 F.3d at 761).

---

[4] Defendants also raise a legitimate argument that Sheppard's MRSA infection cannot be attributed to them, although the issue of causation may also be one to be resolved at a trial.

The Seventh Circuit further noted that Johnson's circumstances were different than those addressed in *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001), in which the court concluded that the plaintiff's failure to protect claim should have survived a motion to dismiss.  *Id*. at 737-38.  In that case, the court noted the plaintiff had alleged that the defendant prison guards knew the plaintiff had written a last will and testament, had previously committed suicide, and had stopped eating; plus, his mother had allegedly called the prison and told staff that her son was suicidal.  *Id.* at 610-11.  Emphasizing that the allegations in *Sanville* did not reveal that the correctional officers were privy to any comparable facts, the Seventh Circuit found the facts distinguishable.  With the differences in circumstances in *Johnson* and *Sanville* in mind with respect to the imminence requirement, the court examines the evidence of each defendant's knowledge as to the risk of Sheppard harming himself on October 27, 2017.[5]

---

[5] Although acknowledging that the *Johnson* decision is not itself precedential, at least three district courts have since found the imminence requirement similarly unmet in circumstances involving no more than expression of general "thoughts" of self-harm or suicide.  *See Williams v. Stacy*, No. 18-C-1426, 2020 WL 6136148, at *2 (E.D. Wis. Oct. 19, 2020) (plaintiff's statements of wanting to go on observation status and "having suicidal thoughts" did not support a finding that defendant had an indication that plaintiff's risk of self-harm was imminent since there was "no basis to infer that [defendant] knew [plaintiff] had the means to harm himself or that the risk of future harm was sure or very likely"); *Wright v. Funk*, No. 19-cv-37-JDP, 2020 WL 4219845, at *4-5 (W.D. Wis. July 23, 2020) (although plaintiff told defendants he was "having suicidal thoughts" and wanted to see someone from psychological services, plaintiff failed to point to evidence that defendants knew "he was on the verge of harming himself, such as knowledge of any previous acts of self-harm"); *Armstead v. Kollman*, No. 19-cv-101, 2020 WL 206809, at *4 (E.D. Wis. Jan. 14, 2020) (plaintiff's statements to defendant that "she felt unsafe in her room, wanted to talk to psychological services, and felt like cutting herself" insufficient to give defendant notice of a substantial risk of serious harm).

### 1. **Kussmaul**

In most respects, Sheppard's interaction with Sergeant Kussmaul is similar to the interactions between the correctional officers and the plaintiff in *Johnson*. Specifically, Sheppard reports telling Kussmaul that he wanted to talk to someone from PSU immediately and that he was having suicidal thoughts. Although Sheppard claims he expressed a desire to see a PSU staff member "immediately," he does not claim to have communicated to Kussmaul that his suicidal thoughts were becoming more urgent, even during their second interaction. Moreover, there is no evidence in the record that would permit a reasonable jury to find that Kussmaul knew: (1) Sheppard had a history of self-harm or placement in observation status for threats of self-harm; or (2) Sheppard had access to any items that he might use to commit self-harm, or even that Sheppard suggested to Kussmaul *how* he would harm himself, during either of their interactions. Consistent with *Johnson* and subsequent district court decisions, therefore, it would seem no reasonable basis exists to conclude that Kussmaul was made aware of a substantial likelihood that Sheppard would imminently harm himself.

Yet taking Sheppard's version of their interactions as true (as this court must), there exists a troubling difference between the interactions in *Johnson* and those here: while in *Johnson*, the correctional officers simply placed the plaintiff in the cell without taking steps to alert mental health professionals to his threat of self-harm, Kussmaul *did* take a step to respond to Sheppard's alleged threat of self-harm. Since Kussmaul chose to take action with respect to Sheppard's request to see someone from PSU, a reasonable factfinder might infer that Kussmaul, in fact, believed Sheppard's statements sufficiently serious to require

possible medical intervention, or at least that he should leave it up to PSU's discretion as to whether an intervention was necessary.  Worse, when Dr. Hoem *explicitly* asked him whether Sheppard expressed any suicidal ideations, he responded in the negative, which according to Sheppard was a lie.  Finally, Kussmaul later lied again when he assured Sheppard that he *had* told Dr. Hoem about his threat of self-harm and that Dr. Hoem still did not want to see him.

Plus, these misrepresentations were potentially material, since Kussmaul surely knew why Dr. Hoem would have asked the question, and Dr. Hoem herself implies that if Kussmaul had communicated Sheppard's threat of self-harm, she likely would have made an effort to see him (or have someone else from PSU see him) that afternoon to talk through his thoughts of self-harm.  And in later lying to Sheppard that Dr. Hoem did not want to see him despite being made aware of his suicidal thoughts, Kussmaul would likely have exasperated Sheppard's sense of despair and abandonment, or so a reasonable jury might believe.  Thus, if the jury credits all of these facts against Kussmaul (admittedly a big if), the combination would be enough to support an inference of deliberate indifference.

Given that the parties dispute whether Sheppard told Kussmaul he was considering self-harm and whether Kussmaul then lied to Sheppard about telling Dr. Hoem about his thoughts of self-harm, qualified immunity is also unavailable to Kussmaul here, even taking *Johnson* into account.   Qualified immunity shields prison officials from liability from monetary damages in circumstances in which their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware.  *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v.*

13

*Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).  To be sure, in response to defendant's qualified immunity defense, Sheppard does not cite any cases standing for the proposition that an inmate's statement that he wanted to see someone from PSU "immediately" and felt suicidal is sufficient to notify a prison official of an imminent threat of serious harm. However, it is well established that prison officials may not ignore a suicidal inmate's mental health needs, and there are disputed facts related to whether Kussmaul did just that in lying to Dr. Hoem about what Sheppard said and again in reporting back to Sheppard as to what Dr. Hoem said.  If Sheppard is believed as to either of these disputes, a reasonable factfinder might conclude that Kussmaul consciously disregarded the risk that he would imminently harm himself.  Accordingly, defendants are not entitled to summary judgment with respect to Sheppard's claim against Kussmaul. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1010-14 (7th Cir. 2013) (denying interlocutory appeal because qualified immunity defense turned on disputed facts).

### 2. Jorgenson

The grant of judgment on Sheppard's claim against Jorgenson is not nearly as close. The undisputed facts show that Jorgenson had *no* knowledge of Sheppard's past acts of self-harm, and Sheppard's statements to him on October 27 do not suggest that he had a specific and immediate plan to harm himself.  The only piece of evidence suggesting any sense of urgency in Sheppard's interactions with Jorgenson is his statement that he "would not be alive tomorrow."  However, context matters:  Sheppard made that statement to him at about 1:30 p.m. on the afternoon of October 27, and Sheppard does not claim to have

14

said anything else indicating that he actually meant he was going to harm himself that afternoon or evening.  To the contrary, Sheppard's only other statement to Jorgenson on October 27 was that he could not bear the pain in his legs.  Sheppard took no actions or made any other statement to Jorgenson indicating *how* he might harm himself, nor that he had the means to do so.  As such, no evidence suggests that Jorgenson had any reason to infer Sheppard had committed self-harm in the past, that Sheppard actually meant he was going to harm himself when he spoke with Jorgenson, or that Jorgenson had reason to believe that Sheppard had the means to harm himself seriously.  As such, Jorgenson's failure to take additional steps to respond to Sheppard's statement that he might not be alive the next day simply does not support an inference that Jorgenson consciously disregarded an imminent threat to his safety.

### 3.  Nurse Beth Edge

Nurse Edge is entitled to summary judgment on the same grounds.  Even accepting Sheppard's assertion that Edge was told he was in a lot of pain and "having thoughts of committing self-harm," and that Edge did nothing in response to that statement, like his statement to Jorgenson, Sheppard's statement that he was considering self-harm does not permit a reasonable inference that he conveyed to Edge how he intended to harm himself, that his plan to harm himself was imminent, or that he had the means to carry it out.  As such, Edge is entitled to judgment in her favor as well.

### 4.  Dr. Hoem

Finally, defendants seek judgment in their favor as to Dr. Hoem because she, too, was unaware of a substantial, imminent risk that Sheppard might seriously harm himself. In opposition, Sheppard claims not only that Dr. Hoem knew he was threatening self-harm on October 27, but also that she knew enough about his history of self-harm to make her failure to do more to ensure he was seen by PSU that day amount to deliberate indifference. Even construing all the evidence in Sheppard's favor, however, a reasonable jury could not find she acted with deliberate indifference.

To start, this claim fails as a matter of law because the record does not support a finding that Dr. Hoem knew that Sheppard was threatening to harm himself.  To the contrary, the only evidence is that Dr. Hoem explicitly asked Kussmaul if Sheppard threatened to harm himself, and Kussmaul responded in the negative.  Although Sheppard claims that Kussmaul reported telling Dr. Hoem that he was thinking of harming himself, that is not evidence that Kussmaul actually told her that he reported self-harm; as previously discussed, it is only evidence that Kussmaul told *Sheppard* that.  The only evidence of record related to Kussmaul's conversation with Dr. Hoem is in Kussmaul's and Dr. Hoem's declarations, which agree Kussmaul reported to Dr. Hoem that Sheppard had not threatened self-harm.  As such, there is no basis to conclude that *Dr. Hoem* knew Sheppard had threatened self-harm.

That just leaves the question of whether Dr. Hoem should have done more in response to Kussmaul's report that Sheppard wanted to see someone from PSU.  On this record, no reasonable factfinder could conclude that she consciously disregarded the risk

that he would commit self-harm.  All Dr. Hoem knew was that Sheppard wanted to see someone from PSU.  This request, alone, certainly does not suggest that Sheppard might imminently harm himself if she did not take prompt action to see him.  Even though Sheppard points to Dr. Hoem's knowledge of his history of placement on observation status and an incident of self-harm from 2014, this was by then approximately three *years* before his request to be seen.

Even assuming Dr. Hoem knew about and considered Sheppard's past, irregular placements in observation status or his 2014 attempt at self-harm, it is undisputed that Kussmaul did not inform her that Sheppard was threatening self-harm, only that he was requesting to see someone from PSU.  A prison official -- even a mental health professional -- cannot be required to equate a request to see a psychologist with a threat of self-harm just because the inmate had some history of self-harm.  Rather, there must be a suggestion of a specific and imminent threat of self-harm.  On this record, no reasonable jury could conclude that Dr. Hoem was aware that Sheppard might commit self-harm soon.  As such, she is entitled to judgment in her favor on the merits.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment (dkt. #28) is GRANTED as to plaintiff Charles Sheppard's claims against Dr. Hoem, Kyle Jorgenson and Beth Edge and DENIED as to his claim against Sergeant Kussmaul.

2.  Plaintiff Charles Sheppard's motion for assistance in recruiting counsel (dkt. #52) is DENIED without prejudice.

3.  At the close of this case, the clerk of court is directed to enter judgment in favor of defendants Dr. Hoem, Kyle Jorgenson and Beth Edge.

17

4. This matter is set for a scheduling conference for **January 21, 2021, at 10:30 a.m.** Counsel for defendant is responsible for initiating the call to the court.

Entered this 30th day of December, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge